UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

HAYVIN GAMING, LLC,

           Plaintiff,

                    Case # 23-CV-6172-FPG

v.

                    DECISION & ORDER

WORKINMAN INTERACTIVE, LLC,

           Defendant.

## INTRODUCTION

This action arises out of a contract dispute between Plaintiff Hayvin Gaming, LLC ("Hayvin Gaming") and Defendant Workinman Interactive, LLC ("Workinman") related to Workinman's work on a mobile poker game called Hayvin Poker. Hayvin Gaming seeks partial summary judgment on two issues: (1) whether the parties, through a January 2–3, 2023 email exchange, modified their September 21, 2022 agreement, and (2) whether Workinman has an artisan's lien on, among other things, Hayvin Poker artwork and source code. ECF No. 43. As explained below, Hayvin Gaming's motion is DENIED.

## BACKGROUND

In 2014, Hayvin Gaming began developing a mobile poker game called Hayvin Poker. ECF No. 43-18 ¶ 4.[1] Beginning in 2020, Hayvin Gaming hired Workinman on several "sprint" contracts to finalize Hayvin Poker and prepare it for release. *Id.* ¶ 5. Later, on September 21, 2022, Hayvin Gaming and Workinman entered into a Master Agreement for Professional Services (the "Agreement"). *Id.* ¶ 9. Unlike the prior, project-based contracts, the Agreement was a fixed-

---

[1] The facts are drawn from Hayvin Gaming's Local Rule 56(a)(1) statement and Workinman's response, ECF Nos. 43-18, 54-13, and the materials they cite.

1

price contract, under which Workinman agreed to provide two full-time developers and one part-time artist to provide dedicated support to the Hayvin Poker project. *Id.* According to Hayvin Gaming, it agreed to pay Workinman $24,000 per month in exchange for two full-time developers contributing a total of 320 hours per month. *Id.* ¶ 10. Workinman disputes this characterization, acknowledging that the deliverables set out in the Agreement included two full-time developers but denying that it required them to "contribute" a "total of 320 hours per month." ECF No. 54-13 ¶ 10. The Agreement further provided that "[a]ll work performed by [Workinman] will be based on a professional day conducted between the hours of 9:00 a.m. and 6:00 p.m., Eastern Standard Time, Monday through Friday." ECF No. 43-18 ¶ 11.

Soon after Workinman began working under the Agreement, Hayvin Gaming had "considerable difficulty" tracking Workinman's work and "ensuring that Workinman was performing the tasks assigned to it." ECF No. 43-18 ¶ 12. Workinman's hour logs show that Workinman developers failed to commit the 320 hours purportedly required under the Agreement, falling, for example, 153 hours short in October 2022 and 27 hours short in November 2022. ECF No. 43-18 ¶¶ 13–15. Workinman, on the other hand, asserts that its employees provided regular, daily updates and communicated with Hayvin Gaming "extensively" and points to inaccuracies in the hour logs. *Id.* ¶¶ 12–15. For example, although the November 18, 2022 and December 16, 2022 hour logs for Workinman employee Justin Dambra worked zero hours on those days, the internal Slack channel shows that he was working and responding to Hayvin Gaming on those days.[2] *Id.*

Within months, the parties' relationship deteriorated. In mid-December 2022, the parties held a video conference call, during which Workinman project director Bryen Aoyama informed

---

[2] Slack is a digital instant messaging program developed for professional and organizational communication.

Hayvin Gaming that Workinman was going to terminate the Agreement because the team was not comfortable with its structure.³  ECF No. 43-18 ¶ 16; *see* ECF No. 43-16 at 1, 3.  During the call, the parties discussed the possibility of reducing the team to one full-time developer, Justin Dambra, and one part-time artist, Brian Thuringer.  *See id.* at 3; *see also* ECF No. 43-18 ¶ 19.

Shortly after the conference call, on January 2, 2023, Hayvin Gaming CEO Bryan Mileski sent Workinman an email demanding that the parties come up with a plan to move forward immediately.  ECF No. 43-18 ¶ 20; ECF No. 43-17 at 56.  Workinman COO, Keith McCullough responded that day, sending Hayvin Gaming an email with an attachment that Hayvin Gaming describes as a "final proposed amendment" of the Agreement, but that Workinman describes as a "proposed estimate" (the "Retainer Estimate").  *Id.* ¶ 21; ECF No. 54-13 ¶ 21.  McCullough's email explained that because the Workinman team wanted a "hard stop date," but believed that Hayvin was "working on finding a replacement team in good faith," the "offer [was] up to 12 weeks from Jan[uary] 3rd (end at March 28th)."  ECF No. 43-7 at 1.  McCullough then stated that "the full agreement is detailed in the attached document."  ECF No. 43-7 at 2.  His email was accompanied by a signature containing his full name and title:

> Keith McCullough
> COO
>
> WM Interactive
> Games at Work

*Id.*  Hayvin Gaming CEO Bryan Mileski responded the next day:

> Hi Keith,
>
> We are ok with this.  Really appreciate your attempt to find an amicable solution.

---

³ Workinman disputes Hayvin Gaming's characterization of the conference call and refers the Court to the transcript of that call.  *See* ECF No. 43-16.  The Court's description of the conference call reflects the Court's independent review of the transcript.

> Thank you for your support the last three years and for helping to get us this far.
>
> It's been a blast working with you, nothing but the utmost respect and love for you and we wish you amazing success!
>
> Thank you,
> Bryan

*Id.* at 1. McCullough replied on January 4:

> To you guys as well!  Let's set Hayvin up for a smooth launch with this time, and onboard a team that will carry the game on to be the massive success it deserves.
>
> Best,
> Keith McCullough

*Id.*

According to Workinman, Mileski's response was not an acceptance of the proposed amendment, and the parties continued to negotiate potential changes to the Agreement, but the parties never agreed to an amendment or modification. *Id.*  According to Hayvin Gaming, these follow-up communications represented "further proposed amendments" which "added or altered material terms of the" purported modified agreement.  ECF No. 43-18 ¶ 26.

Regardless, Hayvin Gaming proceeded in accordance with the terms of the Retainer Estimate, obtaining a new developer who would take over work on Hayvin Poker from Workinman.  ECF No. 43-18 ¶ 27.  Hayvin Gaming also paid Workinman in the amounts described in the Retainer Estimate.  *Id.* ¶¶ 28, 29.  Workinman retained one payment as partial payment for the period of December 16, 2022 to January 15, 2023 and rejected the next two payments as insufficient under the unmodified agreement.  ECF No. 54-13 ¶¶ 28, 29; *see also* ECF No. 43-18 ¶ 38.

4

At the end of January, Workinman informed Hayvin Gaming that it would continue to perform—and bill Hayvin Gaming—under the terms of the Agreement. ECF No. 43-18 ¶¶ 30, 37. Pursuant to Agreement, Workinman billed Hayvin Gaming $24,000 in January, February, and March 2023. *Id.* ¶ 31. The January 2023 hour log show that Workinman's developers and artists again fell short of the 320 hours purportedly required under the Agreement. ECF No. 43-18 ¶ 32. Workinman asserts that the January log, like the previous hour logs, understates how many hours Workinman employees worked. ECF No. 54-13 ¶ 32.

But, according to Hayvin Gaming, Workinman's employees did not even work enough to satisfy the Retainer Estimate's lower hour requirement. ECF No. 43-18 ¶¶ 34–35. For example, the January 2023 hour log shows that a part-time artist worked only 46 of his required 64 hours and a full-time developer worked only 107 of his required 160 hours. *Id.* 34. Accordingly, Hayvin Gaming asserts that Workinman earned just $9,639 of the $14,000 retainer under the Retainer Estimate. *Id.* ¶ 35. As with the earlier hour logs, Workinman claims that its employees "committed considerably more hours" than recorded in the hours log. ECF No. 54-13 ¶¶ 34, 35. Nevertheless, Hayvin Gaming made payments of $14,000 in February and March—payments that Workinman rejected. ECF No. ¶ 43-18 ¶ 38. Then, on March 18, 2023, Workinman issued a notice of default under the Agreement. ECF No. 43-18 ¶ 39; ECF No. 43-17 ¶ 50.

At the core of the dispute between the parties are two sections of the Agreement: (1) Section 4.3, which governs ownership of work product, and (2) Section 8.11, which governs amendment and modification.[4] Hayvin Gaming wants Workinman to "turn over" the source code to the Hayvin Poker project as work product. *See* ECF No. 43-18 ¶ 42. Workinman, on the other hand,

---

[4] Hayvin Gaming also asserts that "the vast majority of" Workinman's work after January 3, 2023 "constituted warranty work that Workinman was required to perform free of charge" under Section 6.1 of the Agreement. ECF No. 43-18 ¶ 44. Workinman disputes this, noting that "warranty work" is not defined in the Agreement. ECF No. 54-13 ¶ 42.

5

refuses to do so because, in its view, the Agreement does not require it.  ECF No. 54-13 ¶ 42.  Each party refers to Section 4.3 of the Agreement to support its position, but emphasizes different provisions.  Hayvin Gaming points to the ownership rights provision, which states that any work product created by Workinman under the Agreement, including the source code, "shall constitute 'works made for hire' for [Hayvin Gaming] . . . and shall be the exclusive property of [Hayvin Gaming]."  ECF No. 43-18 ¶¶ 40, 41.  Workinman highlights subsequent language, which provides that "upon [Hayvin Gaming's] payment of all fees owed to [Workinman] under this Agreement, [Workinman] shall immediately turn over to [Hayvin Gaming] all work product created by [Workinman] under this Agreement as well as all materials and deliverables developed, including . . . source code."  ECF No. 54-13 ¶ 42.  Workinman also claims that it is entitled to an artisan's lien under New York law.  ECF No. 43-18 ¶ 42; ECF No. 54-13 ¶ 42.

The parties also agree that Section 8.11 includes a "no-oral modification" provision, which states that no amendment or modification "shall be binding unless made in writing and duly signed by both parties."  ECF No. 43-18 ¶ 43.  They dispute whether the email accompanying the Retainer Estimate satisfies this requirement.

## LEGAL STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor.  *See Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).  However, the non-moving party

6

"may not rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quotation omitted). But, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," the court must deny summary judgment. *Anderson*, 477 U.S. at 248.

## DISCUSSION

Hayvin Gaming's motion presents two issues: (1) whether Hayvin Gaming, at this stage of the proceedings, is entitled to declaratory judgment that the parties amended the Agreement in January 2023 and (2) whether Hayvin Gaming has established that Workinman does not have an artisan's lien on Hayvin Poker work product. As explained below, Hayvin Gaming has failed to establish that it is entitled to summary judgment on either issue, and its motion for partial summary judgment is therefore denied.

### I.     Modification of the Agreement

Core to the parties' dispute is whether the January 2–3, 2023 email exchange between the parties amended the Agreement, making the terms of the Retainer Estimate binding on Hayvin Gaming and Workinman. Hayvin Gaming asserts that it did, because the email exchange satisfies the signed-writing requirement of Section 8.11 of the Agreement. Workinman says it did not, because the email exchange is not a writing signed by both parties, and the parties continued to negotiate the terms of the modification in the days following that exchange.

In light of Hayvin Gaming's ambiguous response to the Retainer Estimate and the parties' subsequent conduct, Hayvin Gaming has failed to establish that it is entitled to summary judgment on its claim for declaratory judgment.

a. **The Retainer Estimate and the Parties' Email Exchange**

Section 8.11 of the Agreement provides that no modification of the Agreement will be binding on the parties unless it is in writing and signed by both parties. In general, such "no oral modification" clauses are enforceable under New York law. *Israel v. Chabra*, 12 N.Y.3d 158, 163 (2009) (citing N.Y. Gen. Oblig. Law § 15-301(1)). The question is whether the January 2023 email exchange constitutes a modification in writing signed by both parties.

Courts applying New York law have held that email exchanges can satisfy a requirement that a modification of an agreement, or the agreement itself, be in writing. *See e.g.*, *Ion Audio, LLC v. Bed, Bath & Beyond, Inc.*, No. 15-CV-8292, 2019 WL 1494398, at *3–4 (S.D.N.Y. Apr. 2, 2019) (email exchange satisfied "no oral modification" clause); *Stevens v. Publicis, S.A.*, 50 A.D.3d 253, 254–55 (1st Dep't 2009) (email exchange satisfied statute of frauds and no oral modification provision). Like the formation of any contract, "fundamental to the establishment of a contract modification is proof of . . . mutual assent to its terms." *Beacon Term. Corp. v. Chemprene, Inc.*, 75 A.D.2d 350, 354 (2d Dep't 1980). An email exchange may, therefore, "constitute an enforceable contract, even if a party subsequently fails to sign implementing documents, when the communications are sufficiently clear and concrete to establish such an intent." *Brighton Inv., Ltd. v. Har-Zvi*, 88 A.D.3d 1220, 1222 (3d Dep't 2011) (internal quotation marks omitted).

Under New York law, "an acceptance 'must comply with the terms of the offer and be clear, unambiguous, and unequivocal." *Int'l Bus. Machs. v. Johnson*, 629 F. Supp. 2d 321, 330 (S.D.N.Y. 2009) (quoting *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 83 (2d Cir. 1998)). Whether an acceptance is unambiguous or unequivocal "depends not on the subjective, undisclosed intent of the offeree, but rather on the offeree's words and actions as viewed from the

8

perspective of a reasonable person." *Johnson*, 629 F. Supp. 2d at 330 (citing *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir. 1984)); *see also Stockland Martel, Inc. v. Donald J. Pliner of Florida, Inc.*, 32 A.D.3d 779, 782 (1st Dep't 2006) ("[D]efendant's assent to the agreement . . . is not clear and unambiguous from the document itself, and resort to extrinsic evidence is in order."). When an offeree's purported acceptance is ambiguous or equivocal—"that is, [one] that a reasonable person could view as assent, rejection, or an invitation to bargain further . . . it is the offeror's reaction to [it] that controls whether the parties have entered into a contract." *Johnson*, 629 F. Supp. 2d at 330. "In short, how the offeror treats the offeree's language will, assuming that treating the language either as language of acceptance or treating it as language requiring further discussion is reasonable, determine the language's effect." *Id.* at 330–31.

Mutual assent is a question of fact. *See Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 378 F. Supp. 3d 377, 389 (S.D.N.Y. 2005) (citing *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*, 241 F.3d 135, 145 (2d Cir. 2001)). So too are "questions as to what the parties said, what they intended, and how a statement by one party was understood by the other." *Ronan Assocs., Inc. v. Local 94-94 A-94B*, 24 F.3d 447, 449 (2d Cir. 1994).

Construing the evidence in the light most favorable to Workinman, there is sufficient evidence for a reasonable factfinder to conclude that the parties did not amend the Agreement. A reasonable factfinder could conclude that Mileski's response to the Retainer Estimate—that Hayvin Gaming was "ok with this" and "[r]eally appreciated" Workinman's "attempt" to find a solution—was too ambiguous and equivocal to constitute an acceptance of Workinman's proposal. *See Ronan Assocs.*, 24 F.3d at 449; *Bazak*, 378 F. Supp. 3d at 389. Although the email exchange, combined with the Retainer Estimate, could satisfy Section 8.11's no oral modification provision under New York law, the ambiguity of Mileski's response distinguishes the exchange here from

9

those in *Ion Audio* and *Stevens*, which were unambiguous and unequivocal. *See Ion Audio*, 2019 WL 1494398, at *3 ("Confirmed."); *Stevens*, 50 A.D.3d at 254 ("I accept your proposal with total enthusiasm and excitement. . . .").

Moreover, Workinman appears not to have interpreted the response as an acceptance, as McCullough sent a more formal modification agreement to Mileski for his review and signature two days later. *Johnson*, 629 F. Supp. 2d at 330. Mileski responded, indicating that he would review and send back the amended contract, noting that Hayvin Gaming was "ok with" what, in that email, Mileski described as "the *e-mail summary* you sent the other day." ECF No. 54-6 at 4 (emphasis added). The parties therefore appear to have continued to negotiate the terms of an amendment after the email exchange that Hayvin Gaming modified the Agreement. *Id.* at 2–4; ECF No. 54-7 at 2–7.

The ambiguity of Mileski's response and the parties' conduct following the January 2-3 email exchange leave questions of fact that must be resolved before determining whether the parties amended the Agreement. *See Ronan Assocs.*, 24 F.3d at 449; *Bazak*, 378 F. Supp. 3d at 389. Hayvin Gaming has therefore failed to demonstrate that it is entitled to summary judgment on its claim for declaratory judgment that the parties amended the Agreement and that the terms of the Retainer Estimate are binding on the parties.

b. **Binding Preliminary Agreement**

Hayvin Gaming asserts for the first time in its reply brief that the email exchange was, at the very least, "a binding preliminary agreement." ECF No. 57 at 11.[5] There is "no apparent reason [Hayvin Gaming] could not have made this argument in its [opening brief] and thus it

---

[5] In its opening brief, Hayvin Gaming argues only that the email exchange and the Retainer Estimate were enough to satisfy the requirements of Section 8.11 of the Agreement. *See* ECF No. 43-19 at 15–18. Nowhere does Hayvin Gaming assert that the exchange or the Retainer Estimate constituted a binding preliminary agreement. Nor does it cite any case law addressing that issue.

should be deemed waived." *Cadoret v. Sikorsky Aircraft Corp.*, 323 F. Supp. 3d 319, 326 n.7 (D. Conn. 2018) (citing *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993)); *see also Peacock v. City of Rochester*, No. 13-CV-6046, 2016 WL 2347448, at *4 (W.D.N.Y. May 4, 2016) ("[I]t is well settled that '[i]ssues raised for the first time in a reply brief are generally deemed waived.'" (citing *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 91 n.13 (2d Cir. 2010))). Even if the Court were to consider this argument, however, Hayvin Gaming would not be entitled to summary judgment.

"Ordinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract." *Adjustrite Sys., Inc. v. Gab Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998). However, a preliminary agreement may be "fully binding" when the parties agree on "all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document." *Id.* Such an agreement is "preliminary only in form—only in the sense that the parties desire a more elaborate formalization of the agreement." *Id.* It "binds both sides to their ultimate contractual objective in recognition that, despite the anticipation of further formalities, a contract has been reached." *Id.* (internal quotation marks omitted).

In determining whether a preliminary agreement is fully binding, courts "must keep two competing interests in mind." *Adjustrite Sys., Inc.*, 145 F.3d at 548. First, "courts must be wary of trapping parties in surprise contractual obligations they never intended to undertake." *Id.* (internal quotation marks omitted). Second, "courts must enforce and preserve agreements that were intended to be binding, despite a need for further documentation or further negotiation." *Id.* (brackets omitted). "The key, of course, is the intent of the parties." *Id.* That is, "whether the parties intended to be bound and, if so, to what extent." *Id.* at 549. Courts must look to the conduct

of the parties "which constitute[s] objective signs in a given set of circumstances," not subjective evidence of intent. *Id.*

The Second Circuit has identified four factors—the *Adjustrite* factors—to be considered in determining whether a preliminary agreement is fully binding: (1) the language of the agreement; (2) the existence of open material terms; (3) whether there has been partial performance; and (4) the necessity of putting the agreement in final form as indicated by the "customary form of such transactions." *Cohen v. Singer*, 4 F. App'x 38, 40 (2d Cir. 2001) (summary order) (citing *Adjustrite Sys., Inc.*, 145 F.3d at 549). Hayvin Gaming has failed to demonstrate that these factors support the conclusion that the parties intended to be fully bound by the email exchange and the Retainer Estimate such that summary judgment on its declaratory judgment claim is warranted.

"The first factor, the language of the agreement, is the most important." *Adjustrite Sys.*, 145 F.3d at 549. Here, that factor is, at best, neutral. Weighing against the conclusion that the terms of the Retainer Estimate were fully binding, neither the parties' communications nor the Retainer Estimate expressly state that there was a binding agreement or any other express manifestation that the parties were bound by its terms. *See id.* As discussed above, Hayvin Gaming CEO Bryan Mileski's response is too ambiguous to demonstrate "an intent to be bound by the terms discussed." *See Rubinstein v. Clark & Green, Inc.*, 395 F. App'x 786, 789 (2d Cir. 2010) (summary order) (citing *Adjustrite Sys.*, 145 F.3d at 549). On the other hand, nothing in the document itself or the parties' communications expressly provides that it was contingent on, for example, the execution of a more formal agreement. *Cf. id.* (first factor weighed against conclusion that preliminary agreement was fully binding where it was expressly contingent in part upon the execution of a sales agreement contract). *But see Brown v. Cara,* 420 F.3d 148, 154 (2d Cir.2005) (lack of express reservation not to be bound not dispositive). Nor is there any other

reference to a future formal agreement. *Cf. Rubinstein*, 395 F. App'x at 789 (first factor weighed against conclusion that preliminary agreement was fully binding where it provided for the execution of other contracts) (citing *Reprosystem, B.V. v. SCM Corp.*, 727 F.22d 257, 262 (2d Cir. 1984)). This factor is therefore neutral.

The second factor, partial performance, weighs against Hayvin Gaming. On this point, Hayvin Gaming asserts only that it "hired a new developer as required by the" Retainer Estimate. ECF No. 57 at 12. However, it is not clear from that document's language that Hayvin Gaming would be obligated to find a new developer under the amended Agreement. Instead, it appears that the *purpose* of the modification was to give Hayvin Gaming sufficient time to find and onboard a new developer. *See* ECF No. 43-8 at 2 (terms of retainer estimate based on expectation that Hayvin Gaming was "actively looking to bring on new developer during this time"). Moreover, although Hayvin Gaming made three payments of $14,000, consistent with the terms of the Retainer Estimate, Workinman accepted one as partial payment of an invoice for $18,000 under the terms of the Agreement and rejected the other two. Workinman also informed Hayvin Gaming that it was proceeding under the unmodified Agreement. This factor therefore weighs against concluding that the Retainer Estimate was fully binding.

The third factor, open items, weighs against Hayvin Gaming. In light of the expectation that Hayvin Gaming would find and onboard a new developer, one open item in particular stands out: Workinman's continuing obligations, or lack thereof, after Hayvin Gaming did so. The formal modification that Hayvin Gaming rejected does address this issue, unlike the Retainer Estimate. *Compare* ECF No. 43-9 (stating that Workinman's obligations under Agreement as modified automatically terminate 30 days from the date the new developer begins), *with* ECF No. 43-8 (noting that Hayvin Gaming would have option to terminate Workinman team with thirty-days

notice but not discussing effect of new developer starting work). This factor therefore weighs against concluding that the Retainer Estimate was fully binding.

The fourth factor weighs slightly in favor of Hayvin Gaming. A modification to an open-ended master agreement for mobile game development services with a monthly cost of $24,000 like the Agreement would likely be in writing both as a matter of practice and under the terms of the Agreement itself. *See Rubinstein*, 395 F. App'x at 790 (considering cost, duration, and complexity of project in evaluating this factor). However, Hayvin Gaming asserts that Workinman's past practice included amending contracts with Hayvin Gaming through "informal documents like Workinman's January 2, 2023 offer." ECF No. 57 at 12. Workinman employees appear to have acknowledged this as well. *See Id.* n. 27 (citing deposition testimony of Workinman COO Keith McCullough). This factor therefore weighs slightly in favor of concluding that the Retainer Estimate was fully binding.

Two of the four factors weigh against concluding that the parties intended the January 2-3, 2023 email exchange and the Retainer Estimate to be a fully binding preliminary agreement, one weighs in favor, and the most important factor—the language—is neutral. The *Adjustrite* factors therefore generally weigh against Hayvin Gaming's assertion that the email exchange and Retainer Estimate were a fully binding preliminary agreement. In any event, the Second Circuit has cautioned that these factors do not provide a "talismanic scorecard," reminding courts that "the ultimate issue, as always, is the intent of the parties." *Murphy v. Inst. of Int'l Educ.*, 32 F.4th 146, 151 (2d Cir. 2022). And, as the Court has concluded, there remain questions of fact as to the parties' intent as embodied in the email exchange and the Retainer Estimate. Accordingly, Hayvin Gaming is not entitled to summary judgment on its declaratory judgment claim on the basis that

the parties agreed to be fully bound by a preliminary agreement in the form of the January 2-3, 2023 email exchange and the Retainer Estimate.

Hayvin Gaming waived its binding preliminary agreement argument by failing to raise it in its opening brief. But even if it had not, because a reasonable factfinder could conclude that the parties did not intend to be fully bound by the Retainer Estimate, the Court would not conclude that Hayvin Gaming was entitled to summary judgment on that basis.

### c. Conclusion

Hayvin Gaming has failed to establish that it is entitled to summary judgment on its claim that the parties amended the Agreement. It has failed to establish either that there is no genuine dispute of material fact as to whether the parties amended the Agreement through the January 2-3, 2023 email exchange and the Retainer Estimate or that the email exchange and Retainer Estimate should be treated as a fully binding preliminary agreement. Hayvin Gaming's motion for summary judgment on its claim for declaratory judgment is therefore denied.

### II. Artisan's Lien

In its eleventh affirmative defense, Workinman asserts that it is entitled to an artisan's lien under New York Lien Law § 180 and New York common law. Hayvin Gaming argues that it is entitled to summary judgment on this affirmative defense because it complied with its contractual obligations under the Agreement as modified in January 2023. Workinman argues that Hayvin Gaming still owes Workinman under the unmodified Agreement. Because Hayvin Gaming has not demonstrated that it is entitled to summary judgment on the issue of whether the parties amended the Agreement, it is likewise not entitled to summary judgment on Workinman's eleventh affirmative defense.

New York Lien Law § 180 provides that:

> A person who makes, alters, repairs or performs work or services of any nature and description upon, or in any way enhances the value of an article of personal property, at the request or with the consent of the owner, has a lien on such article, while lawfully in possession thereof, for his reasonable charges for the work done and materials furnished, and may retain possession thereof until such charges are paid.

N.Y. Lien Law § 180.

Hayvin Gaming asserts that the Court must grant summary judgment if it finds that "Hayvin Gaming complied with all of its contractual obligations under the parties' Agreement." ECF No. 43-19 at 19. This presupposes that the parties amended the Agreement. But, as explained above, Hayvin Gaming has not established that it is entitled to summary judgment on that issue. Therefore, it has likewise failed to establish that it has complied with all of its obligations under the Agreement. Accordingly, the Court cannot conclude that it is entitled to summary judgment as to whether Workinman retains an artisan's lien on the property at issue under New York Lien Law § 180 or New York common law.

Hayvin Gaming's motion for summary judgment on Workinman's eleventh affirmative defense is therefore denied.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment, ECF No. 43, is DENIED.

IT IS SO ORDERED.

Dated: May 24, 2024
      Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York

16